# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TULARE GOLF COURSE, LLC, a California Limited Liability Company,<br><br>Plaintiff,<br><br>v.<br><br>VANTAGE TAG, INC., a Canadian business entity of unknown form; ARROW CAPITAL SOLUTIONS, INC., a Texas Corporation; U.S. BANK NATIONAL ASSOCIATION, a Delaware Corporation, and DOES 1 through 10, inclusive,<br><br>Defendants. | Case No. 1:21-cv-00505-JLT-SKO<br><br>ORDER GRANTING IN PART MOTION TO COMPEL ARBITRATION AND DENYING WITHOUT PREJUDICE MOTION TO DISMISS<br><br>(Doc. 24; Doc. 25) |

On March 25, 2021, Tulare Golf Course, LLC initiated this action against Vantage Tag, Inc., Arrow Capital Solutions, Inc., and U.S. Bank National Association asserting various dispute of contract claims. (Doc. 1 at 1.) On July 15, 2021, U.S. Bank filed a motion to dismiss the declaratory judgment claim against it (Doc. 24), and Vantage Tag filed a motion to compel arbitration and to dismiss, or in the alternative, dismiss all claims. (Doc. 25.) Tulare does not oppose arbitration, but U.S. Bank does. (Doc. 31; Doc. 32.) Arrow, an intermediary assignee of Vantage Tag who subsequently assigned its rights to U.S. Bank, was dismissed from the action. (Doc. 41; Doc. 42.) For the reasons discussed below, the Court **GRANTS in part** Vantage Tag's motion to compel arbitration and **DENIES without prejudice** U.S. Bank's motion to dismiss.

1

## I.  BACKGROUND

Tulare operates an eighteen-hole golf course in Tulare, California. (Doc. 52 at 1, ¶ 1.) On August 3, 2020, Tulare entered an agreement with Vantage Tag to lease and retain maintenance services on Vantage Tag's "Text System," which is a global positioning system that is designed to "assist golfers and golf course owners in determining distances, navigating courses, and locating course parameters and boundaries." (*Id.* at 3, ¶ 10.) The "Lease-Service Contract" had an initial lease term of five years, with an optional extension term of three years. (*Id.* at 3, ¶ 11.) In exchange, Tulare agreed to make monthly payments of $1,400.00 (*Id.* at 17.) The Lease-Service Contract included an express warranty that Vantage Tag's system be free from defects and that Vantage Tag provide maintenance and repairs if needed. (*Id.* at 3-4, ¶ 12.) However, shortly after Vantage Tag installed the system, it began malfunctioning and causing major disruptions in Tulare's customers' experience on the golf course. (*Id.* at 4, ¶ 15.) Over the next several months, Tulare made repeated demands to Vantage Tag to repair the system. (*Id.* at 4-5, ¶¶ 16-20.) On November 16, 2020, Tulare notified Vantage Tag of its rejection of the system and recission of their agreements, but Vantage Tag refused to de-install the system and stopped responding to Tulare's communication attempts. (*Id.* at 5, ¶¶ 19-21.) The Lease-Service Contract delegates "the resolution of all disputes arising under or in connection with this Agreement" to arbitration in accordance with the Commercial Arbitration Rules of the American Arbitration Association. (*Id.* at 19.)

On September 1, 2020, and prior to the installation of the Vantage Tag Text System, Vantage Tag requested Tulare execute an additional contract entitled Extend Payment Terms Article ("Payment Contract"), which included the same payment price and product description as the Lease-Service Contract. (Doc. 52 at 4, ¶ 13.) The Payment Contract likewise obligated Tulare to make monthly payments of $1,400.00 to Vantage Tag for the Text System. (*Id.* at 26.) The Payment Contact, like the Lease-Service Contract, states that Vantage Tag may freely assign or transfer its right to receive payments under the agreement. (*Id.* at 21, 26.) Both agreements also define Tulare's obligation to make payments at "absolute" and "unconditional." (*Id.* at 18, 26.)

Tulare alleges that it did not offer or receive additional consideration for the Payment Contract.[1] (*Id.* at 4, ¶ 13.) The Payment Contract does not contain an arbitration clause but rather states that Tulare "consents to jurisdiction and venue in New York." (*Id.* at 26-27.)

## II.    MOTION TO DISMISS FOR LACK OF JURISDICTION

In its motion to dismiss, U.S. Bank asserts the action lacks subject matter jurisdiction because Tulare failed to plead complete diversity of the parties pursuant to 28 U.S.C. § 1332(a). (Doc. 24-1 at 6.) Tulare's original complaint and first amended complaint failed to allege the citizenship of its own LLC members or owners, as required to sufficiently plead diversity jurisdiction. *See Kanter v. Warner-Lamber Co.*, 265 F.3d 853, 857 (9th Cir. 2001); *NewGen, LLC v. Safe Cig, LLC*, 840 F.3d 606, 611-12 (9th Cir. 2016). To preserve the motions' priority within the Court's backlog, the Court issued an order to show cause, allowing Tulare to file a second amended complaint to cure the jurisdictional issues. (Doc. 48.) On February 24, 2020, Tulare filed an amended complaint stating its LLC has four members, all of which are "lifelong, permanent residents of Tulare County, California." (Doc. 52 at 2 ¶ 2.) Because Tulare has now alleged the citizenship of all parties and Vantage Tag and U.S. Bank have non-California citizenship, Tulare's second amended complaint addressed the Court's concerns regarding subject matter jurisdiction. Accordingly, the Court's order to show cause (Doc. 48) is **DISCHARGED**.

Subsequently, Vantage Tag refiled their motion to compel arbitration which mostly duplicates its original motion.[2] (Doc. 54.) As noted in the Court's order to show cause, Tulare's filing an amended complaint to cure jurisdictional issues would allow the Court to rule on the previously filed motions without the need to refile and maintain the priority of those motions in the Court's backlog. (Doc. 48.) Out of an abundance of caution, the Court issued a minute order clarifying its intent to rule on the current record and allowed the parties one week to object to the

---

[1] The Court acknowledges that this allegation appears for the first time in the second amended complaint, which the Court permitted Tulare to file for the purposes of curing jurisdictional defects. However, neither Vantage Tag nor U.S. Bank have objected to the additional allegation.

[2] The Court notes that Vantage Tag's new motion seems to be directed only at Tulare, not at U.S. Bank, which suggests Vantage Tag no longer seeks to compel U.S. Bank to arbitration and would eliminate the need for much of the Court's analysis herein. (Doc. 54-2 at 6-8.) However, Vantage Tag also incorporates its earlier motion in the newly filed one. (*Id.* 2.) Therefore, the Court addresses the issues presented in the original motion.

3

Court's proposal. The deadline to object has passed. Because the Court **GRANTS** Vantage Tag's original motion to compel arbitration (Doc. 25) and **DENIES** U.S. Bank's motion to dismiss (Doc. 24), Vantage Tag's later-filed motion to compel arbitration (Doc. 54) is **DENIED as moot**.

### III.   MOTION TO COMPEL ARBITRATION

Vantage Tag filed a motion to compel arbitration pursuant to the Federal Arbitration Act arguing that all of Tulare's claims arise from the Lease-Service Contract which contains a mandatory arbitration provision. (Doc. 25-2 at 5.) Tulare did not oppose the motion; however, U.S. Bank opposes arbitration. (Doc. 31; Doc. 32.) U.S. Bank contends that it is not a party to any arbitration agreement because it entered an agreement separate from the Lease-Service Contract, which does not contain an arbitration provision. (Doc. 31 at 1-2.) Vantage Tag did not file a reply to U.S. Bank's opposition.[3]

**A.   Legal Standards to Compel Arbitration**

The Federal Arbitration Act applies to arbitration agreements in any contract affecting interstate commerce and "governs the allocation of authority between courts and arbitrators." *Cox v. Ocean View Hotel Corp.*, 533 F.3d 1114, 1119 (9th Cir. 2008); 9 U.S.C. § 2. The FAA provides that written arbitration agreements "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. This provision "create[s] a body of federal substantive law of arbitrability applicable to any arbitration agreement within the coverage of the Act." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983). A party seeking to enforce an arbitration agreement may petition the Court for "an order directing the parties to proceed to arbitration in accordance with the terms of the agreement." 9 U.S.C. § 4.

To determine whether to grant a motion to compel, the Court must consider two "gateway" questions: (1) "whether there is an agreement to arbitrate between the parties; and (2) whether the agreement covers the dispute." *Brennan v. Opus Bank*, 796 F.3d 1125, 1130 (2015). "If the response is affirmative on both counts, then the [FAA] requires the court to enforce the

---

[3] Although Tulare stated in its non-opposition to arbitration that U.S. Bank "should be compelled to participate in arbitration," Tulare provided no further response to argument to support its contention. (Doc. 32 at 2.)

4

arbitration agreement in accordance with its terms." *Chiron Corp. v. Ortho Diagnostic Sys.*, 207 F.3d 1126, 1130 (9th Cir. 2000). Thus, a court shall stay or dismiss an action to allow arbitration proceedings to occur. See 9 U.S.C. §§ 3, 4; *see also Delgadillo v. James McKaone Enters. Inc.*, 2012 WL 4027019, at *3 (E.D. Cal. Sept. 12, 2012) ("[O]nce a court determines that an arbitration clause is enforceable, it has the discretion to either stay the case pending arbitration, or to dismiss the case if all of the alleged claims are subject to arbitration"). Because the FAA "is phrased in mandatory terms," "the standard for demonstrating arbitrability is not a high one, [and] a district court has little discretion to deny an arbitration motion." *Republic of Nicaragua v. Standard Fruit Co.*, 937 F.2d 469, 475 (9th Cir. 1991).

Because arbitration is a creation of contract, a court may compel arbitration only when there is a "clear agreement" to arbitrate between the parties. *Davis v. Nordstrom, Inc.*, 755 F.3d 1089, 1092-93 (9th Cir. 2014) (citations omitted). "When determining whether a valid contract to arbitrate exists, we apply ordinary state law principles that govern contract formation." *Id.* at 1093 (citing *Ferguson v. Countrywide Credit Indus., Inc.*, 298 F.3d 778, 782 (9th Cir. 2002)). Under California law, "a 'clear agreement' to arbitrate may be either express or implied in fact." *Id.* (citing *Pinnacle Museum Tower Ass'n v. Pinnacle Mkt. Dev. (US), LLC*, 55 Cal. 4th 223, 236 (2012)).[4] "A party's acceptance of an agreement to arbitrate may be express, as where a party signs the agreement." *Pinnacle*, 55 Cal. 4th at 236. Acceptance of an agreement to arbitrate is implied-in-fact where the conduct of the contracting parties suggests such acceptance. *See Craig v. Brown & Root, Inc.*, 84 Cal. App. 4th 416, 420 (2000) (holding "the employee's continued employment constitutes her acceptance of an agreement proposed by her employer").

"[A]ny doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." *Moses*, 460 U.S. at 24-25. As a result, arbitration should only be denied when "it may be said with positive assurance that the arbitration clause is not susceptible of an

---

[4] The court notes that the Payment Contract has a choice of law provision of New York, but neither party has argued for the application of a particular state laws for the purposes of the motion to compel arbitration. In its motion to dismiss, U.S. Bank states that although the Payment Contract elects New York for the choice of law, New York law and California law "appear to be identical." (Doc. 24-1 at 6.) Accordingly, the Court applies California law. *Wash. Mutual Bank, FA v. Superior Court*, 24 Cal.4th 906, 919 (2001) ("Generally speaking the forum will apply its own rule of decision unless a party litigant timely invokes the law of a foreign state.").

interpretation that covers the asserted dispute." *AT&T Tech., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 650 (1986). It is well-established that "arbitration provides a forum for resolving disputes more expeditiously and with greater flexibility than litigation." *Lifescan, Inc. v. Premier Diabetic Servs., Inc.*, 363 F.3d 1010, 1011 (9th Cir. 2004). However, the presumption in favor of arbitration applies only when determining the scope of arbitrable *issues* but not which *parties* agreed to arbitrate. *See Kramer v. Toyota Motor Corp.*, 705 F.3d 1122, 1127 (9th Cir. 2013); *see also First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944-45 (1995) (holding the presumption for arbitration "reverses" when determining whether certain parties are subject to arbitration in cases of "silence or ambiguity"). "Courts should not assume that the parties agreed to arbitrate arbitrability unless there is 'clea[r] and unmistakabl[e]' evidence that they did so." *Kaplan*, 514 U.S. at 939.

In resolving a motion to compel arbitration, the court applies a standard similar to that of a motion for summary judgment brought pursuant to Rule 56 of the Federal Rules of Civil Procedure. *See Smith v. H.F.D. No. 55, Inc.*, 2016 WL 881134, at *4 (E.D. Cal. Mar. 8, 2016) (citations omitted). "The party opposing arbitration receives the benefit of any reasonable doubts and the court draws reasonable inferences in that party's favor, and only when no genuine disputes of material fact surround the arbitration agreement's existence and applicability may the court compel arbitration." *Id.* (citing *Three Valleys Mun. Water Dist. v. E.F. Hutton & Co.*, 925 F.2d 1136, 1141 (9th Cir. 1991)). Rule 56 does not require that the absence of any factual dispute, but there must be no genuine issue of material fact. *See Hanon v. Dataproducts Corp.*, 976 F.2d 497, 500 (9th Cir. 1992). "A material fact is genuine if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "Conversely, '[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Id.* (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

**B.     Whether U.S. Bank Was Assigned the Lease-Service Agreement**

The parties' dispute involves two contracts. U.S. Bank maintains it was assigned only the rights to receive payments pursuant to Payment Contract and "never took assignment of the

1  Service Contract" (i.e., the Lease-Service Contract). (Doc. 31 at 1-2.) Although arbitration
2  clauses typically bind the contract's assignees (*Comedy Club, Inc. v. Improv West Associates*, 553
3  F.3d 1277, 1287 (9th Cir. 2009)), U.S. Bank maintains it is not an assignee of any arbitration
4  agreement because the Payment Contract does not contain an arbitration provision. (Doc. 31 at 2.)
5  Tulare alleges that U.S. Bank sent a notice alerting Tulare of the assignment from Arrow and
6  attaching the Lease-Service Contract but not the Payment Contract. (Doc. 52 at 6, ¶ 24.)
7  Therefore, the parties dispute whether U.S. Bank was assigned rights under the Lease-Service
8  Contract in addition to the Payment Contract.

9  Under California law, "[t]he burden of proving an assignment falls upon the party
10  asserting rights thereunder." *Heritage Pac. Fin., LLC v. Monroy*, 215 Cal. App. 4th 972, 988
11  (2013) (quoting *Cockerell v. Title Ins. & Trust Co.*, 42 Cal. 2d 284, 292 (1954)). An assignment
12  agreement "must describe the subject matter of the assignment with sufficient particularity to
13  identify the rights assigned." *Mission Valley E., Inc. v. Cty. of Kern*, 120 Cal. App. 3d 89, 97
14  (1981)). To effectuate an assignment, the owner of the right must manifest his or her "intention to
15  transfer, without further action or manifestation of intention, the right to such other person, or to a
16  third person." *Cockerell*, 42 Cal. 2d at 291; *see also Heritage*, 215 Cal. App. 4th at 988 ("While
17  no particular form of assignment is required, it is essential to the assignment of a right that the
18  assignor manifests an intention to transfer the right." (Internal quotations omitted)).

19  The evidence of the parties' intentions surrounding the scope of U.S. Bank's assignment
20  conflicts slightly. On the one hand, the "Specification of Assigned Interests," ("Assignment
21  Agreement") the agreement between Arrow and U.S. Bank memorializing the transfer, suggests
22  that assignment only included rights under the Payment Contract. (Doc. 31-1 at 5-6.) The
23  Assignment Agreement does not refer to the Lease-Service Contract by name, but rather,
24  identifies the Payment Contract as the subject matter of the transfer. (*Id.*) The Assignment
25  Agreement identifies the Payment Contract as the "Customer Agreement," where Customer refers
26  to Tulare and by listing the identification number ending in "518-0001," which appears on the
27  face of the Payment Contract but not on the Lease-Service Contract. (*Id.*) The Assignment
28  Agreement indicates that the Payment Contract was attached, but the Lease-Service Contract was

not attached. (*Id.* at 6.)

On the other hand, the assignment notices sent to Tulare by Arrow and U.S. Bank contain conflicting manifestations of the parties' intent regarding the scope of the transfer. Arrow's notice, dated December 9, 2020, states:

> Customer is hereby notified that *all right, title and interest* of Vantage Tag Systems, Inc. ('Seller'), in and to the Contract, the payments due under the Contract, the *property leased* or financed thereunder ('Product') and the rights and remedies of Seller under the Contract, have been assigned to Arrow Capital Solutions, Inc. ('Purchaser').

(Doc. 52 at 29 (emphasis added).) Although this statement indicates that Arrow received "all rights" Vantage Tag held in its "property leased," i.e., the lease outlined in the Lease-Service Contract, Tulare alleges that Vantage Tag informed Tulare that only the Payment Contract, "but not the Lease-Service Contract," rights were transferred to Arrow. (*Id.* at 6, ¶ 23.) Nonetheless, Tulare alleges the assignment notice from U.S. Bank shows an assignment of all rights under both agreements, because it states the "servicing" of the "contract" has been assigned to U.S. Bank by Arrow Solutions, Inc. (*Id.* at 6, ¶ 24.) Tulare further alleges that U.S. Bank only attached the Lease-Service Contract, but not the Payment Contract, with its notice. (*Id.*) Tulare, however, did not submit to the Court a copy of U.S. Bank's notice and attachments to support its allegations.

Even assuming these allegations are true, U.S. Bank's notice to Tulare specifically identified the Payment Contract with the identification number VTS-01518-0001, which appears only on the face of the Payment Contract, as the relevant transfer. (Doc. 31-1 at 7.) Because Arrow could only assign rights that it held and because Tulare does not dispute that Arrow only received rights under the Payment Contract, it does not follow that U.S. Bank could have received rights to both the Payment Contract and the Service Contract. *Bank of the West v. Commercial Credit Fin. Servs., Inc.*, 852 F.2d 1162, 1174 (9th Cir. 1988) (holding the transferee "cannot acquire greater rights" than the transferor owned). Although the burden rests on the party asserting the assigned rights, on a motion to compel, the Court must weigh materially disputed facts in favor of the party opposing arbitration. Thus, for the purposes of determining if arbitration is necessitated, the Court finds U.S. Bank was not assigned Vantage Tag's rights under the Lease-Service Contract.

**C.      Non-Signatory Exceptions**

Even if U.S. Bank was not a signatory or assignee of the Lease-Service contract containing the arbitration agreement, certain exceptions exist to compel non-signatories to arbitration. U.S. Bank identified five exception that it contends do not apply—incorporation by reference; assumption; agency; veil-piercing/alter ego; and estoppel. (Doc. 31 at 3-4.) Neither Tulare nor Vantage Tag provided any response or argument as to why the arbitration provision binds U.S. Bank as a non-signatory. Vantage Tag merely states that U.S. Bank is an assignee of "all of VTS's right, title and interest and to" the Contract." (Doc. 25-2 at 8.) Vantage Tag did not address the distinction between the two contracts or provide support for why it believes U.S. Bank was assigned and therefore bound by the Lease-Service Contract terms.

1. <u>Construing Both Agreements as One</u>

To the extent Vantage Tag intended to argue that both agreements should be construed as one, the objective evidence does not support the conclusion that the arbitration provision may be read into the Payment Contract. Under Civil Code § 1642, multiple contracts that relate "to the same matters, between the same parties, and made as parts of substantially one transaction, are to be taken together." Therefore, generally two or more separately executed instruments "may be considered and construed as one contract only when upon their face deal with the same subject matter and are by reference to one another so connected that they may be fairly said to be interdependent." *Merkeley v. Fisk*, 179 Cal. 748, 754 (1919). "[W]here two or more written instruments are executed contemporaneously, with reference to each other, for the purpose of attaining a preconceived objective, they must all be construed together and effect given if possible to the purpose intended to be accomplished; and this principle controls whether each of the several instruments was signed by all or only some of the parties to the transaction. *Goodman v. Severin*, 274 Cal. App. 2d 885, 895 (1969).

Although this rule governing interdependent contracts provides an interpretative tool, it does not determine whether a particular term of one instrument applies to the other. *Subaru of Am., Inc. v. Putnam Auto., Inc.*, 60 Cal. App. 5th 829, 838 (2021) ("[E]ven if two contracts could be considered one transaction, this fact is not dispositive."). "While it is the rule that several

contracts relating to the same matters are to be construed together, it does not follow that for all purposes they constitute one contract." *Mountain Air Enterprises, LLC v. Sundowner Towers, LLC*, 3 Cal. 5th 744, 760 (2017) (quotations omitted). Construing two agreements "in light of one another" does not "merge them into a single written contract." *Id.*; *see also Pankow Const. Co. v. Advance Mortg. Corp.*, 618 F.2d 611, 616 (9th Cir. 1980). Rather, construing two agreements together pursuant to § 1642 functions as an interpretive aide, and the Court must nonetheless consider traditional principles of contract interpretation to determine whether the terms of one agreement apply to the other. *Amtower v. Photon Dynamics*, 158 Cal. App. 4th 1582, 1610 (2008) (holding that "a discrete term contained in one agreement does not necessarily apply to the parties of the other agreements" even when the multiple contracts form a "single integrated transaction").

The incorporation of contract provisions into an interdependent agreement depends on the mutual intent of the parties. *Subaru*, 60 Cal. App. 5th at 838; *Fuentes v. TMCSF, Inc.*, 26 Cal. App. 5th 541, 549 (2018) ("[J]ust as when any issue turns on contractual interpretation, we must look to the mutual intent of the parties."). "Such intent is to be inferred, if possible, solely from the written provisions of the contract." *State of Cal. v. Cont'l Ins. Co.*, 55 Cal. 4th 186, 195 (2012). Under California law, "clear and explicit" language of the contract governs. *ACL Techs., Inc. v. Northbrook Prop. & Cas. Ins. Co.*, 17 Cal. App. 4th 1773, 1784 (1993), *as modified* (Sept. 21, 1993) (quoting *Bank of the W. v. Superior Court*, 2 Cal. 4th 1254, 1264 (1992); *see also* Cal. Civ. Code, § 1638. The "clear and explicit" meaning of the contract retains its "ordinary and popular sense," unless "used by the parties in a technical sense or a special meaning is given to them by usage." *Pension Tr. Fund for Operating Eng'rs v. Fed. Ins. Co.*, 307 F.3d 944, 949-50 (9th Cir. 2002) (citations omitted). In other words, "if the meaning a lay person would ascribe to contract language is not ambiguous, we apply that meaning." *Id.* Moreover, "[t]he terms of a contract must be construed in a manner that takes into account the context of the language and is consistent with the contract as a whole." *Great Minds v. Office Depot, Inc.*, 945 F.3d 1106, 1110 (9th Cir. 2019) (citations and modifications omitted); *see also City of Atascadero v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 68 Cal. App. 4th 445, 473 (1998), *as modified on denial of reh'g* (Jan. 6, 1999) ("Any contract must be construed as a whole, with the various individual

provisions interpreted together so as to give effect to all, if reasonably possible or practicable.").

The Lease-Service Contract and Payment Contract likely constitute interdependent instruments, together designed to attain one preconceived objective, and should be construed together. Although executed a month apart, both documents identify Tulare and Vantage Tag as the primary parties. (Doc. 52 at 3-4, ¶¶ 9, 13; *id.* at 17, 26.) The two agreements serve the common objective of providing a lease of the Vantage Tag Text System to Tulare in exchange for $1,400.00 monthly payments, an obligation that appears on the face of both contracts. (*Id.* at 17-27.) None of the parties contend that the Payment Contract obligated Tulare to pay $1,400.00 *in addition* to the amount owed under the Lease-Service Contract.

Nonetheless, construing the two instruments together does not determine whether the arbitration clause of the Lease-Service Contract applies to the Payment Contract. The explicit language of the Payment Contract agreement demonstrates that the parties did not intend for the arbitration provision of the Lease-Service Contract to apply because the Payment Contract contains a choice of law and venue provision that contradicts delegation to arbitration. (Doc. 52 at 26-27.) The Payment Contract requires disputes to be resolved under New York law and states that Tulare "consents to jurisdiction and venue in New York." (*Id.*) Applying the arbitration provision of the Lease-Service Contract to Payment Contract would render the choice of law provision meaningless. *People v. Doolin*, 45 Cal. 4th 390, 413 n. 17 (2009) ("Courts must interpret the contractual language to give force and effect to every provision and avoid an interpretation that renders some clauses nugatory, inoperative or meaningless. (Internal quotations omitted)). Because the Payment Contract unambiguously directs parties to bring suit in a New York court, the Court concludes the parties did not intend to incorporate the arbitration requirement of the Service-Lease Contract. *Ahern v. Asset Mgmt. Consultants, Inc.*, 74 Cal. App. 5th 675, 694 (2022) (holding § 1642 did not require the arbitration clause to be read into a jointly executed contract because the contract without the arbitration clause "expressly contemplated [a party] could initiate a lawsuit or other proceeding before a 'court, arbitrator or other authority.'").

    2.   Equitable Estoppel Exception

"Equitable estoppel precludes a party from claiming the benefits of a contract while

11

simultaneously attempting to avoid the burdens that contract imposes." *Comer v. Micor, Inc.*, 436 F.3d 1098, 1101 (9th Cir. 2006) (internal quotations omitted). In the arbitration context, the doctrine has generated "two lines of cases."[5] *See Mundi v. Union Sec. Life Ins. Co.*, 555 F.3d 1042, 1046 (9th Cir. 2009). First, "a non-signatory is estopped from avoiding arbitration if it knowingly seeks the benefits of the contract containing the arbitration clause." *Crowley Mar. Corp. v. Bos. Old Colony Ins. Co.*, 158 Cal. App. 4th 1061, 1070 (2008); *see also Arthur Andersen LLP v. Carlisle*, 556 U.S. 624, 630 (2009) (explaining that state law determines "the question of who is bound by [arbitration agreements]"). The party opposing arbitration must receive a "direct benefit under the contract containing an arbitration clause before a reluctant party can be forced into arbitration." *Crowley*, 158 Cal. App. 4th at 1070-71; *see also Int'l Paper Co. v. Schwabedissen Maschinen & Anlagen GMBH*, 206 F.3d 411, 418 (2000) (holding a non-signatory is estopped from avoiding arbitration where "he has consistently maintained that other provisions of the same contract should be enforce to benefit him").

Second, a non-signatory may be compelled to arbitrate when it has a "close relationship" with a signatory of the agreement containing the arbitration clause and when the claims are "intertwined with the underlying contractual obligations." *Mundi*, 555 F.3d at 1046; *JSM Tuscany, LLC v. Superior Court*, 193 Cal. App. 4th 1222, 1241 (2011) ("[A] nonsignatory plaintiff can be compelled to arbitrate a claim even against a nonsignatory defendant, when the claim is itself based on, or inextricably intertwined with, the contract containing the arbitration clause.").[6] Under California law, claims are intertwined with the contract when they depend on the existence of the agreement and "the signatory must rely on the terms of the written agreement in asserting its claims against the nonsignatory." *Kramer*, 705 F.3d at 1128 (citing *Goldman v. KPMG LLP*, 173 Cal. App. 4th 209, 222 (2009)).

---

[5] Additional variations and justifications of the equitable estoppel doctrine exist for instances where the non-signatory seeks to compel a signatory to arbitration. *See Kramer*, 705 F.3d at 1128-29.

[6] Arguably, the *JSM* court's opinion suggests that in cases of compelling a non-signatory to arbitration the "close relationship" element is not required. The *JSM* court stated that "nonsignatory plaintiffs [] can also be required to arbitrate their claims which are dependent upon, or inextricably intertwined with, the obligations imposed by the [agreement with the arbitration provision]." *JSM*, 193 Cal. App. 4th at 1239. The court stated "this is particularly true where" the plaintiffs are "related entities" but did not set forth their established relationship as a separate factor. *Id.* at 1240. However, the Ninth Circuit cases, such as *Mundi* and *Kramer*, *infra*, retain the close relationship requirement.

1    U.S. Bank argues that it "never exploited the Service Agreement, and Vantage Tag has not
2 alleged any facts to the contrary." (Doc. 31 at 5.) However, the record and U.S. Bank's own
3 admissions implicate the potential applicability of the equitable estoppel doctrine.  Under the first
4 theory of equitable estoppel, U.S. Bank sought benefits that flow at least indirectly from the
5 Lease-Service Contract because it demanded Tulare make the payments for the lease of Vantage
6 Tag's Text System. U.S. Bank notified Tulare of the assignment and U.S. Bank's right to
7 received future payments. (Doc. 31-1 at 7.) With its notice, U.S. Bank allegedly sent an invoice
8 for $8,540.00 for amounts identified as "past due" and "late fees." (Doc. 52 at 6, ¶ 24.) The
9 obligation for Tulare to make payments to Vantage Tag, and by assignment to U.S. Bank,
10 arguably would not exist without the lease and service of Vantage Tag's Text System pursuant to
11 the Lease-Service Contract. The Lease-Service Contract sets forth the same obligation on Tulare
12 as the Payment Contract to make the $1,400.00 monthly payments. (*Id.* at 17, 26.) Tulare alleges
13 that it received no additional consideration for the Payment Contract beyond that already
14 promised in the Lease-Service Contract. (*Id.* at 6, ¶ 24.) The Payment Contract and U.S. Bank's
15 assignment agreement also acknowledge that payments are premised on benefits corresponding to
16 the Vantage Tag Text System given that these documents identify it as the relevant equipment in
17 which U.S. Bank received an interest. (*Id.* at 26; Doc. 31-1 at 5.)

18    By opposing Tulare's claim for declaratory judgment, U.S. Bank seeks to enforce the
19 Payment Contract and receive payments for the Vantage Tag Text System, an obligation
20 originally imposed on Tulare by the Service Contract. (Doc. 24-1 at 12.) U.S. Bank relies on
21 language in both contracts to argue that Tulare's obligation to pay is "absolute and
22 unconditional." (Doc. 24-1 at 3.) Thus, U.S. Bank relied on Tulare's payment obligations
23 imposed under both contracts. *See Figuerola Peruvians, L.L.C. v. N. Am. Peruvian Horse Ass'n*,
24 2009 WL 10673941, at *8 (C.D. Cal. Dec. 18, 2009) (internal quotations omitted) (compelling
25 non-signatory of association's bylaws to arbitration where the non-signatory relied upon other
26 rules and regulations in the bylaws in entering contracts with third parties and to dispute the
27 association's registration decisions that affected those contracts).

28    On the other hand, nothing in the record suggests that U.S. Bank *knew* the right to receive

payments stemmed from the Lease-Service Contract. U.S. Bank's Assignment Agreement with Arrow only identifies the Payment Contract as the subject of the agreement. (*See* Doc. 31-1 at 5-6.) Although Tulare alleges that U.S. Bank attached the Lease-Service Contract with its notice, Tulare did not file any evidence or documentation to support this allegation. The notice seems to contradict Tulare's allegation because it identifies the Payment Contract, through the identification number "VTS-01518-0001," as the relevant transfer. (Doc. 31-1 at 7.) U.S. Bank asserts its right via the Payment Contract stands alone in creating Tulare's unconditional and absolute obligation to pay. (Doc. 31 at 5.) Arguably, U.S. Bank asserts a benefit *directly* from the Payment Contract and only *indirectly* from the Lease-Service Contract.

Under the second theory of equitable estoppel, the intertwined nature of Tulare's claims with the Lease-Service contract, point strongly toward estopping U.S. Bank from avoiding arbitration. Tulare asserts that it owes no duties or obligations either to Vantage Tag or U.S. Bank because Vantage Tag breached the Lease-Service Contract by delivering non-conforming goods; breached its express warranty in the Lease-Service Contract; breached the implied warranty of merchantability and fitness; induced Tulare to enter the agreements through fraud; and must indemnify Tulare for any payments due to U.S. Bank. (Doc. 52 at 6-11.) Thus, the validity of Tulare's request for declaratory judgment seemingly arises from and is dependent on the existence of and performance of the Lease-Service Contract. *See Kramer*, 705 F.3d at 1131 ("[T]he correct analysis is whether Plaintiffs would have a claim independent of the existence of the Purchase Agreement." (Emphasis omitted)).

Moreover, U.S. Bank's assertion that Tulare's obligation to pay is "unconditional" and "absolute" regardless of Vantage Tag's alleged breach likely involves examination of the Service Contract as well as the Payment Contract because the jointly executed, interdependent agreements refer to Tulare's obligation with same terms. *Compare Campos v. Campos Family Farms, LLC*, 2012 WL 2090303, at *11 (E.D. Cal. June 8, 2012) (compelling plaintiffs to arbitrate where the "resolution of [their] claims requires an examination of the contracts themselves"); *with Crowley*, 158 Cal. App. 4th at 1071 (holding equitable estoppel did not compel arbitration where the party sought relief based on equitable rights against the insurer rather than rights defined by the

14

contract). Because Tulare's claim depends at least in part on the existence and validity of the Lease-Service Contract, the declaratory judgment claim appears "legally intertwined" with the agreement containing an arbitration clause which broadly applies to "the resolution of all disputes arising under or in connection with this Agreement." (Doc. 52 at 19); *see Turtle Ridge Media Grp., Inc. v. Pac. Bell Directory*, 140 Cal. App. 4th 828, 831-34 (2006) (finding the business tort claims, which arose from an advertiser's fraudulent statements inducing plaintiff into a subcontract, sufficiently intertwined with the parent contract, that contained an arbitration clause, because the claims concerned the business dealings arising from the "tripartite" of the subcontract and contract).

Regarding the element requiring a close relationship among the parties, the Court finds this question more difficult to resolve. On the one hand, U.S. Bank does not have a mere arms-length relationship with the signatories of the Lease-Service Contract. *See Black v. Del Webb Comm., Inc.*, 2006 WL 8446305, at \*\*3-4 (C.D. Cal. Oct. 27, 2006) (finding equitable estoppel inapplicable where the party opposing arbitration was merely one on a list of potential vendors in the contract with the arbitration clause because the non-signatory did not have "more than an arms-length relationship with a signatory"). Rather, U.S. Bank, as an assignee "stands in the shoes" of Vantage Tag in terms of its rights to receive any monetary benefit under either contract. *See Turtle Ridge*, 140 Cal. App. 4th at 834 n.6 (2006) (holding the defendant could compel a non-signatory to arbitrate claims because defendant entered a subcontract with the plaintiff to perform the work pursuant to the parent agreement, which contained the arbitration clause). On the other hand, the Court has not found and the parties have not cited any authority to suggest that a partial assignee, receiving only the benefits of one contract but not the obligations of the other, satisfies the "close relationship" standard for equitable estoppel.

The Court finds the lack of argument or response from Vantage Tag telling in this regard. As the moving party compelling arbitration, Vantage Tag bears the burden of showing an agreement to arbitrate exists among the parties. *See Ashbey v. Archstone Prop. Mgmt., Inc.*, 785 F.3d 1320, 1323 (9th Cir. 2015). The Ninth Circuit has warned against expanding the "narrow" application of equitable estoppel to compel an unwilling party into arbitration. *Mundi*, 555 F.3d at

1046 ("[I]n light of the general principle that only those who have agreed to arbitrate are obliged to do so, we see no basis for extending the concept of equitable estoppel of third parties in an arbitration context beyond the very narrow confines delineated in these two lines of cases."). Because the favorable presumption towards arbitration does not apply when determining *who* is bound by the agreement, the Court finds the balance tips slightly in favor of finding equitable estoppel does not apply. Accordingly, the Court **DENIES** the motion to compel U.S. Bank to arbitration but **GRANTS** the motion as to Tulare as unopposed.

## IV.   STAY OF PROCEEDINGS

Even though the U.S. Bank is not compelled to arbitration, the Court finds a stay of all proceedings pending the resolution in arbitration is appropriate. When the Court finds a valid agreement to arbitrate exists between the parties and covers the claims asserted, it has little discretion and must grant the motion to compel arbitration. *See Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 218 (1985) ("By its terms, the Act leaves no place for the exercise of discretion by a district court, but instead mandates that district courts shall direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed."). The Court, however, retains discretion to issue a stay of the case or to dismiss it entirely, if all claims are subject to the arbitration agreement. *Ortiz v. Hobby Lobby Stores, Inc.*, 52 F. Supp. 3d 1070, 1089 (E.D. Cal. 2014) (quoting *Delgadillo*, 2012 WL 4027019, at *3). Even when only some parties agreed to arbitrate, a stay of the entire case may be warranted where the arbitration of claims against one party will likely resolve factual disputes "coextensive with claims against nonparties to that arbitration agreement." *SteppeChange LLC v. VEON Ltd.*, 354 F. Supp. 3d 1033, 1045 (N.D. Cal. 2018); *see also Tarbell v. Caliber Home Loans, Inc.*, 2021 WL 963837, at *3 (E.D. Cal. Mar. 15, 2021) ("[W]hen some parties in a case have agreed to arbitrate and others have not, a district court may stay the whole action 'as a matter of its discretion and to control its docket.'" (quoting *Moses*, 460 U.S. at 20 n.23 (1983))). "In that situation, a stay would avoid inconsistent factual findings and the duplication of efforts." *Tarbell*, 2021 WL 963837, at *3.

As previously discussed, Tulare's declaratory judgment claim against U.S. Bank is inextricably intertwined with the claims against Vantage Tag to be resolved in arbitration.

Tulare's assertion that the Payment Contract lacks consideration may rest on factual findings related to Vantage Tag's misconduct and the alleged fraud that induced Tulare to enter the agreements that obligated Tulare to make payments for an inoperable product. Moreover, the interpretation of the Payment Contract's terms that payments are "unconditional" and "absolute" will likely be influenced by the definition given to the same terms found in the Lease-Service Contract. Finally, Tulare seeks indemnity from Vantage Tag for any payments owed under either agreement,[7] which may moot the declaratory judgment claim or Tulare's obligation to pay U.S. Bank. Given the substantial factual overlap, the Court, in its discretion, concludes a stay of the entire proceedings is appropriate.

## V.   ORDER

For the reasons stated above, the Court **ORDERS**:

1. Vantage Tag's motion to compel arbitration (Doc. 25) is **GRANTED in part** as to Tulare and **DENIED in part** as to U.S. Bank.
2. U.S. Bank's motion to dismiss (Doc. 24) is **DENIED without prejudice** to renewal.
3. This case is administratively **STAYED** pending the final resolution of arbitration of Tulare's claims against Vantage Tag. The parties **SHALL** file a joint status report every 120 days and **SHALL** file a joint notice within **seven days** of the date arbitration is completed.

IT IS SO ORDERED.

Dated:   **March 21, 2023**

*[signature: Jennifer L. Thurston]*
UNITED STATES DISTRICT JUDGE

---

[7] Even if the indemnity claim against Vantage Tag arises directly from the Payment Agreement, not the Lease-Service Contract, the arbitration clause encompasses this claim because applies to all disputes "in connection" to the agreement. (Doc. 52 at 19.)

17